

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00064-CV

QUIKTRIP CORPORATION                                           APPELLANT

V.

GLENN GOODWIN, INDIVIDUALLY                                    APPELLEES
AND ON BEHALF OF THE ESTATE
OF MELANIE THERESE
GOODWIN, AND PEGGY
GOODWIN, INDIVIDUALLY AND
ON BEHALF OF THE ESTATE OF
MELANIE THERESE GOODWIN

------------

### FROM THE 393RD DISTRICT COURT OF DENTON COUNTY
### TRIAL COURT NO. 2009-60224-393

----------

## OPINION

----------

On an early morning in September 2007, Ernesto Reyes saw nineteen-year-old Melanie Therese Goodwin at a QuikTrip store, briefly spoke with her, entered her car, and brutally raped and murdered her away from the store.  A

split jury found appellant QuikTrip Corporation liable for Melanie's tragic death and awarded damages to appellees Glenn Goodwin and Peggy Goodwin, each appearing individually and on behalf of Melanie's estate. Appellant asks us to reverse the trial court's judgment in accordance with the verdict because, among other reasons, appellant did not have a duty to protect Melanie from Ernesto. Because we conclude that the evidence negates any such duty as a matter of law, we reverse the trial court's judgment and render a take-nothing judgment for appellant.

**Background Facts**

Melanie, a bubbly and energetic person, worked with her friend, Sarah Hurley, to promote Red Bull. One night in September 2007, their jobs required them to visit several video game stores in the Denton area for the midnight release of a new game. They finished working early the next morning, and Melanie drove Sarah to an apartment complex.

Before driving home, Melanie wanted to buy food for her boyfriend, Jose. She drove to a QuikTrip store, where Chinedu Anyadike (Chin), who was in his twenties, was working as an assistant manager. Chin worked overnight shifts, and on that morning, he was the only employee in the store.

Nearly an hour before Melanie drove to the store, Ernesto arrived there alone. Soon after entering the store, he asked Chin if he could use a phone. Ernesto, who had a short haircut and a bulky frame, paced with the store's cordless phone while asking his ex-girlfriend, Andrea, to pick him up from the

2

store.[1]  After Andrea declined and their conversation ended, Ernesto began talking to Chin.  He told Chin that he did not have a car and that his mother had kicked him out of her house after he had beaten up his brother,[2] who had raised a bat during the fight.  Ernesto asked whether he could sleep at the store, and Chin said no.  During the conversation, a male customer walked in, and Ernesto appeared to unsuccessfully ask him for a ride.

Ernesto used profane but calm language while talking to Chin and did not show signs of physical aggression.  Chin perceived Ernesto as using "[e]veryday young vernacular."[3]  Ernesto was friendly to Chin.  During Ernesto's near hour in and around the store, several customers, including at least five women other than Melanie, entered the store and made purchases.  Ernesto did not interact with the majority of them.

Chin allowed Ernesto, who said he had no money, to get a fountain drink. Ernesto again called Andrea, telling her, within earshot of Chin, that he did not have anywhere to go and that he did not have any friends.  Ernesto said that he had broken Andrea's phone, and Chin told him that he needed to "control [his]

---

[1]Ernesto and Andrea had an "on-again-off-again" relationship that spanned four years.  Andrea, who lived about ten to fifteen minutes from the store, permanently ended the relationship the day before Ernesto walked there.

[2]Ernesto said that he had broken his brother's nose.  Andrea's testimony indicates that this event occurred days before Ernesto arrived at the store.

[3]Another witness testified that it is "fairly common" for customers to speak profanely in convenience stores.

3

temper." Ernesto also told Chin that he had pending arrest warrants but did not disclose what crime the warrants concerned. Ernesto said that he planned on remaining at the store until someone kicked him out. Even after Chin pled with Andrea by phone to come and get Ernesto, she refused. She told Chin that Ernesto had stolen her car; Ernesto told Chin that he had only borrowed it.[4]

Toward the end of Ernesto's second conversation with Andrea, Chin told him that the police were not "friendly" and that they enjoyed harassing people. Ernesto said that he was hungry. Chin gave him some food that Chin had brought from home[5] and told Ernesto that he could "hang" at the store but that he would eventually get tired.[6] Chin urged Ernesto to call a friend for help. Ernesto made more unavailing phone calls.

After Ernesto had been in the store for nearly twenty-five minutes, he left. About fifteen minutes later, he reentered and again asked to use the phone. As

---

[4]Andrea later testified that on the day before Ernesto went to QuikTrip, she "woke up around 2:00 or 3:00 o'clock in the morning. And [she] walked around and [Ernesto] wasn't in the bed or anything. And [she] went downstairs and [she] didn't see . . . him anywhere. . . . And [minutes later] he came back and [she] was very mad."

[5]Chin testified that he was attempting to be "a decent human being" by giving Ernesto the drink and food. QuikTrip's corporate representative testified, "[W]e train the store employees that having a positive and a friendly attitude is a very high level of priority that we have. We want to show respect to all customers. We want to have it be an inviting experience."

[6]A surveillance video shows Chin making this statement. Chin later testified that he told Ernesto that he could not stay in the store. Melanie's father, Glenn, acknowledged that Chin had asked Ernesto to leave.

before, he could not persuade anyone to pick him up. He left again. While he paced on the pavement outside the store's front windows, Melanie came into the store. She grabbed chips and a drink, placed them on a counter near the register, and walked to the back of the store to use the restroom. Ernesto continued to pace outside the store, occasionally looking in through windows.

Melanie walked out of the restroom, and Ernesto entered the store. While again using profane language, he asked Melanie for a ride at the back of the store while Chin helped a customer at the register. To Chin, Melanie seemed "kind of hesitant" to help Ernesto. After the customer left, Chin walked toward Ernesto and Melanie.

As Melanie talked on her cell phone to Jose while walking toward the register, Ernesto and Chin followed behind her. Melanie continued her phone conversation while buying the items she had placed on the counter. Ernesto left the store but waited near the front door outside. Just before leaving the store, Melanie said the words "pretty normal." She did not tell Jose that she planned on giving Ernesto a ride. She walked toward the driver's door of her car, and Ernesto walked toward the front of her car. They drove away together soon thereafter;[7] it appeared to Chin that Melanie had agreed to give Ernesto a ride.[8]

---

[7]Apparently before Ernesto and Melanie left the store's parking lot, a call was placed from her cell phone to one of Ernesto's acquaintances.

[8]The police initially determined that Ernesto had abducted Melanie. At trial, appellant's corporate representative opined that Ernesto went to the passenger side of Melanie's car and that the surveillance video did not show "any

5

Andrea later called the store's phone and told Chin that she intended to pick up Ernesto, but Chin told her that Ernesto had already left.

After Melanie and Ernesto left QuikTrip's property, he raped and brutally murdered her by blunt force and strangulation. After 4 a.m. on the morning of Melanie's murder, Ernesto dragged her body into a ditch and burned it. Later, the police found her car in a parking lot. Ernesto fled to Mexico. After he returned, a jury convicted him of murdering Melanie, and a trial court sentenced him to imprisonment for life.

Appellees sued appellant. In their original petition, they asserted that appellant was negligent because, among other acts or omissions, it had failed to provide a safe environment for Melanie, an invitee, and had failed to warn her about the danger that Ernesto posed. Appellees amended the petition several times; their live pleading at the time of trial sought wrongful death and survival damages[9] based only on a premises liability claim. Specifically, appellees argued that appellant was liable because it had failed to enforce its safety policies, had failed to provide a safe environment, and had failed to warn Melanie of Ernesto's dangerousness.

kind of struggle," including physical contact from Ernesto to Melanie. The parties dispute whether the evidence proves an "occurrence" on appellant's property—Melanie's alleged abduction—to support a premises liability claim. Based on our holding below, we need not reach that question.

[9]See Tex. Civ. Prac. & Rem. Code Ann. §§ 71.002(a), .021(a) (West 2008).

6

Appellant answered the suit by asserting, in part, that it could not have reasonably foreseen Ernesto's criminal acts against Melanie. Before trial, appellant filed a no-evidence motion for summary judgment, arguing that it had no duty to warn or protect Melanie because there was no foreseeable and unreasonable risk of harm to her. Appellees responded to appellant's motion and also sought summary judgment. The trial court denied all summary judgment motions.

At trial, the jury received stipulations that the parties' expert witnesses had reached opposite conclusions concerning whether the statements that Ernesto made to Chin should have caused Chin to reasonably foresee Ernesto's propensity for violence on appellant's premises. But the jury learned that the parties' experts had agreed that under "similar circumstances as existed at [QuikTrip] on [the morning of Melanie's murder], . . . [no] person could reasonably have foreseen that Ernesto . . . would commit the specific act of rape and/or murder against a stranger."

The jury also heard that Chin was aware of three alarms in the store that he could have activated to alert corporate security about a problem. If Chin had activated one of the alarms, personnel in Oklahoma could have viewed live surveillance video from the store, could have assessed the situation, and could have contacted Chin (to learn why he had triggered the alarm) or the police. Chin also could have directly asked Ernesto to leave, called a supervisor for advice, or called the police. Melanie's mother testified that she blamed appellant

7

for Melanie's death because Ernesto "was in the store when [she] walked in, and he shouldn't have been."

The QuikTrip store in Denton had been open only a few months before Melanie's murder. During that time, no employee of the store had activated the store's alarm for an emergency.

James Kubala, appellant's Director of Operations Systems, agreed that during Ernesto's time in the store, Chin had learned that Ernesto had warrants, was tired and hungry, and had no place to sleep, no money, no cell phone, no car, and no one to pick him up. Nonetheless, Kubala testified that from his experience working in QuikTrip stores, if he had been in Chin's place on the night of Melanie's death, he would have viewed Ernesto as "down and out" and an annoyance but would not have perceived that Ernesto posed a threat to her. According to Kubala, customers telling stories similar to what Ernesto told Chin is not uncommon.

Once the parties completed their presentation of evidence and arguments, ten jurors found that appellant's negligence proximately caused harm to Melanie and that appellant was 28% responsible for what had occurred.[10] The jury awarded damages for Melanie's pain and mental anguish; her funeral and burial expenses; and her parents' loss of companionship, mental anguish, and cost for

---

[10]The jury found that Melanie was 1% responsible and that Ernesto was 71% responsible.

psychological treatment. After the parties filed competing postverdict motions,[11] the trial court signed a final judgment awarding appellees $2,246,250.70 from appellant along with prejudgment interest, postjudgment interest, and costs. Appellant filed an unfruitful motion for new trial and brought this appeal.

## No Foreseeability, No Duty, and No Liability

In its first issue, appellant contends that we must reverse the trial court's judgment because under the circumstances, appellant had no duty to protect Melanie from a sexual and violent crime committed by Ernesto. Particularly, appellant argues that Ernesto's harming Melanie was not foreseeable in terms of its character and severity and that precedent from our supreme court therefore precludes liability. We agree.

In a negligence case, the threshold inquiry is whether the defendant owes a legal duty to the plaintiff. *Boerjan v. Rodriguez*, 436 S.W.3d 307, 310 (Tex. 2014). When material facts are undisputed, the existence of a duty is a question of law that only the court is entitled to answer. *See id.*; *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009).

Premises liability is a special form of negligence in which the duty owed to the plaintiff, if any, depends on the status of the plaintiff—invitee, licensee, or

---

[11]In appellant's motions and in the argument on the motions, it repeatedly contended that it had no duty toward Melanie because Ernesto's crimes against her were not reasonably foreseeable.

trespasser—at the time of the incident giving rise to the lawsuit.[12] *Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 592 (Tex. App.—Fort Worth 2008, pet. denied), *cert. denied*, 555 U.S. 1138 (2009); *see Taylor v. Louis*, 349 S.W.3d 729, 734 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005)). If no duty exists, then no liability for a premises liability claim can arise. *Dukes*, 252 S.W.3d at 592; *see Hyde v. Hoerauf*, 337 S.W.3d 431, 435 (Tex. App.—Texarkana 2011, no pet.). When the injured party is an invitee, the elements of a premises liability claim are actual or constructive knowledge of a condition on the premises by the owner, the condition's posing of an unreasonable risk of harm, the owner's failure to exercise reasonable care to reduce or eliminate the risk, and proximate causation from that failure to the plaintiff's injury. *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000).

Our supreme court has repeatedly emphasized that generally, a defendant has no legal duty to protect another from the criminal acts of a third person. *Graham Cent. Station, Inc. v. Pena*, No. 13-0450, 2014 WL 2790578, at *2 (Tex. June 20, 2014); *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010); *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998). But a defendant who controls premises has a "duty to use ordinary care to protect [an invitee] from criminal acts of third parties if he knows or has

---

[12]It is undisputed that Melanie was an invitee on appellant's premises.

10

reason to know of an unreasonable and foreseeable risk of harm to the invitee." *Pena*, 2014 WL 2790578, at *2; *see Del Lago*, 307 S.W.3d at 767; *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 655 (Tex. 1999) (plurality op.) ("With regard to criminal acts of third parties, property owners owe a duty to those who may be harmed by the criminal acts only when the risk of criminal conduct is so great that it is both unreasonable and foreseeable."). The foreseeability requirement "protects the owners and controllers of land from liability for crimes that are so random, extraordinary, or otherwise disconnected from them that they could not reasonably be expected to foresee or prevent the crimes." *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 17 (Tex. 2008) (footnotes omitted); *see also Houston Lighting & Power Co. v. Brooks*, 161 Tex. 32, 38, 336 S.W.2d 603, 606 (1960) (stating that there "is neither a legal nor moral obligation to guard against that which cannot be foreseen").

The supreme court has created two frameworks under which lower courts should analyze whether property owners have a duty to protect against third parties' criminal acts against invitees. First, where past criminal conduct has occurred at or near the premises, courts should examine the proximity, recency, frequency, similarity, and publicity of that conduct to determine whether similar future conduct was reasonably foreseeable. *See Del Lago*, 307 S.W.3d at 767–68 (quoting *Timberwalk*, 972 S.W.2d at 757); *Trammell Crow*, 267 S.W.3d at 15; *see also Park v. Exxon Mobil Corp.*, 429 S.W.3d 142, 145 (Tex. App.—Dallas 2014, pet. denied) ("These factors have come to be known as 'the *Timberwalk*

11

factors.'").  The parties appear to agree that no duty arose under this framework; indeed, the evidence shows that this QuikTrip store opened soon before the incident and that no emergent situations had occurred on the premises before Melanie's death.

Instead, appellees focus their duty argument (and the trial court premised its duty finding) on the framework applied in *Del Lago*,[13] which based the imposition of a duty upon "actual and direct knowledge" of an "imminent" occurrence on the premises.  307 S.W.3d at 769.  Because both parties heavily rely on *Del Lago* for their competing arguments on duty, we must examine the facts and holdings from that case.

In *Del Lago*, the plaintiff was injured in a fight that occurred near a bar on a large resort.  *Id.* at 764.  The plaintiff was at the resort to attend a fraternity reunion.  *Id.* at 765.  He and other fraternity members went to the bar near 9 p.m., and later that night, several male members of a wedding party also entered the bar.  *Id.*  Hostilities, including heated verbal confrontations and hand gestures, almost immediately arose between the two groups and grew more severe as the night went on.  *Id.*  The confrontations involved intoxicated patrons and "recurred throughout a ninety-minute period."  *Id.*  Inside the bar, pushing,

_____

[13]The trial court stated that it had intended to grant summary judgment for appellant if not for *Del Lago*.  On appeal, appellees contend that this case "is remarkably similar to . . . *Del Lago*."

12

yelling, cursing, and face-to-face contact began. *Id.* at 765–66. As the supreme

court stated,

> Tensions finally came to a head when the bar staff attempted to close the bar. After the crowd refused to leave, the staff went table to table and formed a loose line to funnel the customers toward a single exit and into the conference center lobby. [The plaintiff] testified that the staff was literally pushing the hostile parties out of the bar through the exit, prompting a free-for-all. He recalled that "it was just a madhouse," with punches, bottles, glasses, and chairs being thrown, and bodies "just surging." . . .
>
> . . . .
>
> No one could give an exact number of fight participants, but estimates ranged from twenty to forty men, about equally divided between the wedding party and the fraternity.

*Id.* at 766. When the plaintiff entered the fight to remove a friend who had a

heart condition, he was attacked and suffered a skull fracture and brain damage.

*Id.*

Under those circumstances, in a "narrow and fact-specific holding," a

divided supreme court held that the harm to the plaintiff was foreseeable and that

the resort had a duty to prevent it. *Id.* at 769–70, 774. The court explained,

> The nature and character of the premises can be a factor that makes criminal activity more foreseeable. In this case, the fight occurred in a bar at closing time following ninety minutes of heated altercations among intoxicated patrons. . . . [A]s common sense dictates, intoxication is often associated with aggressive behavior.
>
> More generally, criminal misconduct is sometimes foreseeable because *of immediately preceding conduct.* The Second Restatement of Torts explains that since the landowner "is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, *or are about to occur.*" If "he

13

should reasonably anticipate . . . criminal conduct on the part of third persons, either generally *or at some particular time*, he may be under a duty to take precautions against it." The Third Restatement of Torts clarifies further: "[I]n certain situations criminal misconduct is sufficiently foreseeable as to require a full negligence analysis of the actor's conduct. Moreover, the actor may have sufficient knowledge of the *immediate circumstances* . . . to foresee that party's misconduct." . . .

In this case, *Del Lago observed*—but did nothing to reduce— an hour and a half of verbal and physical hostility in the bar. From the moment the wedding party entered, there was *palpable and escalating tension.* Del Lago continued to serve drunk rivals who were engaged in repeated and aggressive confrontations.

*That a fight broke out was no surprise*, according to the testimony of three fraternity members. . . . [E]veryone could tell serious trouble was brewing. . . . [T]he fight was not unexpected but merely "a matter of time." . . .

We hold that Del Lago had a duty to protect [the plaintiff] because Del Lago had *actual and direct knowledge* that a violent brawl was *imminent* between drunk, belligerent patrons and had ample time and means to defuse the situation. Del Lago's duty arose . . . because it was aware of an unreasonable risk of harm at the bar that very night. When a landowner "has actual or constructive knowledge of any condition on the premises that poses an unreasonable risk of harm to invitees, he has a duty to take whatever action is reasonably prudent" to reduce or eliminate that risk.

. . . .

We do not announce a general rule today. We hold only, on these facts, that during the *ninety minutes of recurrent hostilities at the bar*, a duty arose on Del Lago's part to use reasonable care to protect the invitees from *imminent assaultive conduct.* The duty arose because the likelihood and magnitude of the risk to patrons reached the level of an unreasonable risk of harm, *the risk was apparent* to the property owner, and the risk arose in circumstances where the property owner had readily available opportunities to reduce it.

. . . .

14

. . . [O]n *this* record *this* sequence of conduct on *this* night in *this* bar could foretell *this* brawl.

*Id.* at 768–70, 777 (emphasis added) (footnotes omitted).

The facts here are not analogical to those in *Del Lago.* We conclude that the distinctions between the two cases, as discussed below, rob the facts in this case of the predictive value apparent in *Del Lago* and therefore compel a different result on the issue of foreseeability.

First, the supreme court emphasized that Del Lago's duty arose because events occurring on the premises portended imminent assaultive conduct. *See id.* at 769–70. Over the course of ninety minutes, Del Lago's employees observed obvious hostilities between two groups, and those same hostilities directly contributed to the plaintiff's injuries after employees forced the groups out of the bar. *See id.* Here, during Ernesto's time in the store, he was profane but casual, controlled, calm, and not physically aggressive toward Chin or any patron inside the store, including Melanie. Ernesto told Chin about illicit activity he had engaged in—including the fight with his brother (which prompted police involvement),[14] the stealing or borrowing of (and then returning of) his girlfriend's car, the destruction of his girlfriend's phone, and his pending (although unspecified) warrants—but described the activity as occurring away from the premises and in the past. No fact in this case mirrors the immediately preceding, observed conduct in *Del Lago* that foretold the immediately following assaultive

_____

[14]Ernesto appeared to tell Chin that his brother hit him first.

15

act. The circumstances in *Del Lago* were "palpable and escalating"; the circumstances here were, by comparison, stale. *See id.* at 769 (explaining that "Del Lago's duty arose not because of prior similar criminal conduct but because it was aware of an unreasonable risk of harm at the bar *that very night*" (emphasis added)).

Next, the harm caused to the plaintiff in *Del Lago* was a natural and predictable progression from the conduct that preceded it. As the supreme court explained, after more than an hour of verbal and physical hostilities inside the bar, that a fight broke out outside the bar was "no surprise" and was merely a "matter of time." *Id.* In other words, the brawl that occurred outside the bar had the same character, with only greater severity, as the foretelling verbal and physical confrontations inside the bar. But here, even if Ernesto's illicit activity had occurred in Chin's presence or had immediately preceded Ernesto's entrance into the store, the illicit activity, comprising comparatively minor assault and property crimes that Ernesto disclosed without significant context of the events that preceded them, is not nearly of the same character as abduction, rape, and murder.[15] *Cf. Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d

---

[15]Appellant argued in a postverdict hearing that "the biggest difference between *Del Lago* and this case is that the conduct in *Del Lago* [was] similar in kind to the conduct that caused the harm." As appellant contends on appeal, "QuikTrip had no reason to suspect that an alleged loiterer with family problems would brutally rape and murder a complete stranger." Nor can we conclude that in conjunction with Ernesto's self-described illicit activity, Chin should have construed Ernesto's numerous and unavailing pleas for a ride; his profane but calm speech; or his statements concerning lack of money, homelessness,

472, 478 (Tex. 1995) (affirming a trial court's decision to grant summary judgment in a negligence case because "prior DWI convictions did not indicate criminal conduct in any way akin to sexual assault of young boys"); *Maurer v. 8539, Inc.*, No. 01-09-00709-CV, 2010 WL 5464160, at *5 (Tex. App.—Houston [1st Dist.] Dec. 30, 2010, no pet.) (mem. op.) ("'[E]ntry' and misdemeanor theft are not sufficiently similar to aggravated robbery to make such a crime foreseeable."); *Jane Doe 1 v. Pilgrim Rest Baptist Church*, 248 S.W.3d 831, 836 (Tex. App.—Dallas 2008, pet. denied) ("Prior fights between young people using the gym during a sporting event does not make the general danger of a sexual assault foreseeable."); *Sanders v. Herold*, 217 S.W.3d 11, 17 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (noting that "foreseeability is often determined by whether the defendant is aware of prior, *similar behavior* by the third party" (emphasis added)); *see also Tex. Real Estate Holdings, Inc. v. Quach*, 95 S.W.3d 395, 399–400 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (concluding that a carjacking incident in which the plaintiff was shot was not foreseeable when in the two years before the incident, there were no other reports of stranger-initiated violent crime involving injuries but only an assault between relatives, three auto thefts, and five thefts from vehicles).

And Ernesto's conduct within the store was no more predictive; he did not, for example, make inappropriate sexual remarks or acts to women, physically

hunger, or friendlessness as clues that a violent and sexual crime would imminently occur.

17

accost any of the several women who entered the store before Melanie, or express present thoughts about violence. His interaction with Melanie—asking her for a ride—was consistent with his principal focus in the preceding hour, as evidenced from his repeated but unavailing phone calls and his conversation with a male customer. The parties' experts agreed that no person could reasonably have foreseen that Ernesto was prone to rape and murder Melanie.

For a duty to exist in a case like this one, the defendant need not be able to foresee an exact sequence of events that produces harm, but the defendant must be able to foresee at least the general nature of the crime committed. *See Mellon Mortg.*, 5 S.W.3d at 655 ("[W]e consider . . . the foreseeability of the general criminal act [and] the foreseeability that the victim might be injured by the act."); *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996) ("[T]he Walkers are entitled to summary judgment if they established as a matter of law that *violent criminal acts like the stabbing* were not foreseeable." (emphasis added)); *see also Trammell Crow*, 267 S.W.3d at 16 (comparing characteristics of previous crimes on the premises to determine whether the kind of crime at issue was reasonably foreseeable); *Miranda v. TriStar Convenience Stores, Inc.*, No. 01-11-01073-CV, 2013 WL 3968337, at *8 (Tex. App.—Houston [1st Dist.] Aug. 1, 2013, no pet.) (mem. op.) ("Nor is illegal gambling conducted on eight-liner

gambling machines sufficiently similar to the April 27, 2007 armed robbery to put TriStar on notice of the potential for such criminal activity.").[16]

Furthermore, while the same combatants participated in the foreboding hostilities inside the bar and the brawl outside the bar in *Del Lago*, Ernesto told Chin about prior illicit acts against people with whom he had deep connections (a brother and an ex-girlfriend) and then raped and murdered a total stranger. As several Texas courts have explained, domestic disputes do not typically augur more serious crimes against strangers. *See Timberwalk*, 972 S.W.2d at 758 ("[A] spate of domestic violence . . . does not portend third party sexual assaults or robberies."); *Walker*, 924 S.W.2d at 377–78; *Taylor*, 349 S.W.3d at 737 ("Kelley's knowledge of Hal's history of family violence does not make it foreseeable to her that Hal would assault [a third party] in her home. Isolated instances of domestic violence between residents do not indicate an unreasonable risk of assault between unrelated nonresidents on the property."); *see also Ramirez v. AHP Mut. Hous. Ass'n., Inc.*, No. 14-04-00159-CV, 2005 WL 425486, at *2 (Tex.

---

[16]Appellees cite a 1985 case to argue that Ernesto's illicit acts portended a violent and sexual crime against Melanie. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 550–51 (Tex. 1985). In *Nixon*, the court held that a rape at an apartment complex was foreseeable when within the last two years at the complex, "one attempted murder, two aggravated robberies, two aggravated assaults, sixteen apartment burglaries, four vehicle burglaries, four cases of theft, five cases of criminal mischief, and one auto theft" had occurred. *Id.* at 548, 550–51. The acts that Ernesto reported to Chin are not nearly as extensive in frequency or severity.

App.—Houston [14th Dist.] Feb. 24, 2005, no pet.) (mem. op.) (explaining that domestic violence incidents are "not similar to a random attack from a stranger").

In sum, the nature of the alleged crimes and the relational status of the victims vary significantly from what Ernesto told Chin to what he later did to Melanie.

Finally, the supreme court indicated in *Del Lago* that in addition to the confrontations between the two groups that foretold the fight, the presence of a bar, where alcohol is served and people may become intoxicated, should have raised the resort's awareness of a possible fight on the premises. 307 S.W.3d at 768 ("The nature and character of the premises can be a factor that makes criminal activity more foreseeable. . . . [A]s common sense dictates, intoxication is often associated with aggressive behavior."). We have not located evidence indicating that a convenience store akin to the QuikTrip in Denton has a "nature and character" that makes sexual and violent crimes associated with the premises more common than at other businesses hosting invitees. And certainly, in the short time the store in question was open before Melanie's death, it was not associated with sexual crimes or violence.[17]

---

[17]Melanie's father testified that she had visited the QuikTrip store in Denton several times before her death and that she had never expressed any concerns for her safety after doing so. Kubala testified that during his tenure with QuikTrip, he had never heard of any other alleged abductions from a store or of any rapes or murders that followed someone loitering in a store. Kubala did not classify Ernesto as a loiterer. He reasoned,

A loiter[er] is someone that shouldn't be there. . . .

20

In their argument on foreseeability, appellees heavily rely on the surveillance video from the night of the rape and murder. At the hearing on the parties' postverdict motions, the trial judge stated,

> Let me make it very clear to all the Appellate Courts that are going to review this decision. It was clear that the jury reviewed that videotape, not once but several times. . . .
>
> Any Appellate Court that reviews this, I request that they do the same thing and look at this tape, at least, twice or three times, and look at each of the comments made by Mr. Reyes, look at the reaction made by the clerk to those comments and look at the policies of this company all in context, and look at those final few seconds of when they go out together and when he turns, and that's -- I'm referring to Mr. Reyes. And when I take that whole picture -- I do admit, it's a very close question.
>
> But when you take that whole picture, I cannot say and I think the test is, is there -- two tests, is it more than a scintilla of evidence and, two, is it manifestly unjust? And I can't say what the jury did in this case as no evidence or that it's manifestly unjust, so the verdict stands. . . .
>
> . . . [The videotape] is the critical piece of evidence that relates to the issue[] of . . . foreseeability.

We have, as implored by the trial court and appellees, reviewed the surveillance video several times. We note, however, that a focused and repeated viewing of the top-down, third-person surveillance video by a court that has the benefit of knowing the tragic events that followed is not the best measurement of what should have been anticipated by Chin, who had a limited,

---

> Ernesto Reyes had a reason to be there. Whether you want to say it was a good reason, he was there for a reason. He was there because he was distraught, he's out on his own, he doesn't have a ride. He had a story.

21

first-person view of the events in the store; saw them only once while dividing his attention with other tasks related to his employment; and did not have foreknowledge of the events that would occur later that morning. Whether a risk of criminal activity was foreseeable "must not be determined in hindsight but rather in light of what the premises owner knew or should have known before the criminal act occurred." *Timberwalk*, 972 S.W.2d at 757.

Appellees argued in the trial court that appellant's "own policies proved foreseeability." They contend on appeal that the jury's verdict "does not put any burden on Quiktrip that it has not already assumed." In 2007, one of appellant's employee-training documents stated, "QuikTrip is legally responsible for safety of all customers in stores and on property." Another document stated, "Watch for customers who enter your store with no car parked where you can see it. Watch for people that loiter, that seem to be waiting for business to drop off. Let your manager know about them." Another training document stated, "You and your customers are the most important concern of QT. . . . Don't put yourself or customers at risk." A corporate document concerning safety stated, "A person who is not working safely can hurt themselves, customers[,] or other employees and can cost QuikTrip a tremendous amount of money."

While these policies appear to relate, at least in part, to the prevention of crime on appellant's premises, they do not establish that Ernesto's sexual and violent crime against Melanie was foreseeable or create a duty where none otherwise exists. *See Park*, 429 S.W.3d at 149 ("[T]aking measures to protect

22

against the possibility of future crime is not the same as foreseeing that criminal activity."); *Cleveland Reg'l Med. Ctr., L.P. v. Celtic Props., L.C.*, 323 S.W.3d 322, 351 (Tex. App.—Beaumont 2010, pet. denied) ("A company's internal policies or procedures will not create a negligence duty where none otherwise exists."); *Owens v. Comerica Bank*, 229 S.W.3d 544, 547 (Tex. App.—Dallas 2007, no pet.) ("The Texas Supreme Court has refused to create a standard of care or duty based upon internal policies, and the failure to follow such policies does not give rise to a cause of action in favor of customers or others."); *Allen v. Connolly*, 158 S.W.3d 61, 67 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("The mere act of taking preventative measures . . . is not the same as foreseeing . . . criminal activity. . . . To hold otherwise would virtually eliminate the foreseeability requirement for a negligence claim against a person who installs a security system or takes other preventative measures to guard against crime."); *Entex, A Div. of Noram Energy Corp. v. Gonzalez*, 94 S.W.3d 1, 10 & n.19 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (collecting cases). Moreover, we have explained that for a duty to arise through a voluntary undertaking, the defendant must have increased the risk of harm or the plaintiff must have relied on the defendant's undertaking to make the premises safe. *City of Haltom City v. Aurell*, 380 S.W.3d 839, 853 (Tex. App.—Fort Worth 2012, no pet.). Appellees do not contend, and the evidence does not show, that appellant's policies increased Melanie's risk of harm or that she knew of or relied on the policies.

Considering all of the facts that Chin knew or should have known before Ernesto's rape and murder of Melanie, for the reasons stated above, we conclude as a matter of law[18] that Melanie's abduction, rape, and murder specifically, or even a violent and sexual crime against a stranger generally, were not foreseeable and probable results to him. *See Baylor Med. Plaza Servs. Corp. v. Kidd*, 834 S.W.2d 69, 75 (Tex. App.—Texarkana 1992, writ denied) ("To impose responsibility for negligence, it must have been foreseeable that this event or some similar event would result as a natural and probable consequence."). Thus, we follow the typical rule and hold that appellant had no duty to protect Melanie from that harm. *See Del Lago*, 307 S.W.3d at 767; *Mellon Mortg.*, 5 S.W.3d at 655. Because appellant had no duty as a matter of law, it cannot be liable. *Dukes*, 252 S.W.3d at 592. We therefore sustain appellant's first issue, which requires us to reverse the trial court's judgment and render a take-nothing judgment for appellant.[19]

---

[18]In denying appellant's motion for a directed verdict after the parties had finished presenting evidence, the trial judge said, "I think this is the classic case where 12 people in the community get to . . . make the call." But when material facts are undisputed, duty, as determined by foreseeability, is a question of law for the court, not a question of fact for the jury. *See Del Lago*, 307 S.W.3d at 767; *Escoto*, 288 S.W.3d at 404. Appellees do not identify disputed, material facts that would impact our determination about foreseeability; rather, the parties primarily disagree about the legal significance of undisputed facts.

[19]Thus, we decline to address appellant's second through fifth issues, in which it contends that the judgment should be reversed because the trial court committed error in the jury charge and because there was no evidence to prove proximate cause, an "occurrence" on appellant's premises, or the jury's allocation

## Conclusion

Having sustained appellant's first issue, we reverse the trial court's judgment and render a take-nothing judgment.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

DELIVERED:  November 13, 2014

---

of fault.  *See* Tex. R. App. P. 47.1; *D.R. Horton-Tex., Ltd. v. Savannah Props. Assocs., L.P.,* 416 S.W.3d 217, 229 (Tex. App.—Fort Worth 2013, no pet.).