**Reverse and Render; Opinion Filed November 3, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00131-CV

### JPMORGAN CHASE BANK, N.A., Appellant
### V.
### SOFIA BORQUEZ, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CRESENCIO BORQUEZ, MERCEDES BORQUEZ, INDIVIDUALLY, AND JOEL BORQUEZ, INDIVIDUALLY, Appellees

**On Appeal from the County Court at Law No. 1**
**Dallas County, Texas**
**Trial Court Cause No. CC-09-09096-A**

## OPINION

Before Justices Francis, Lang, and Evans
Opinion by Justice Lang

At issue in this case is whether appellant JPMorgan Chase Bank, N.A. ("Chase") owed Cresencio Borquez the duty to protect him from criminal acts of third parties on Chase's premises. Borquez, who was employed by Brink's, Inc. ("Brink's"), was fatally shot during an attempted robbery while he was servicing an outdoor automated teller machine ("ATM") at a Chase branch bank. Borquez's family and estate ("plaintiffs" or "appellees") filed this lawsuit, alleging Chase failed to provide adequate safety and security on its premises. Following a jury trial, Chase was found liable for negligence and premises liability. In accordance with the jury's verdict, the trial court signed a final judgment awarding plaintiffs damages and prejudgment interest in the amount of $4,341,968, plus costs and post-judgment interest.

On appeal, Chase asserts six issues. Specifically, Chase contends the trial court reversibly erred by (1) submitting plaintiffs' claims to the jury, because Chase owed no duty to Borquez as a matter of law and there was no evidence, or factually insufficient evidence, to support the claims; (2) excluding "numerous categories of relevant evidence"; (3) overruling Chase's objections to plaintiffs' medical expert; and (4) committing jury charge errors respecting a predicate "control" question, Brink's proportionate responsibility as either a settling party or responsible third party, and exemplary damages. Additionally, Chase asserts the jury's failure to find the shooter and/or his accomplice responsible for any part of plaintiffs' damages was so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

We decide in favor of Chase on its first issue. Accordingly, we need not reach Chase's remaining issues. We reverse the trial court's judgment and render a take-nothing judgment in favor of Chase.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The parties do not dispute that the events in question took place at approximately 9:40 a.m. on Friday, September 18, 2009, outside of a Chase branch bank located at 2530 Fort Worth Avenue in Dallas, Texas (the "Stevens Park branch" or the "branch").[1] At the time of those events, Brink's employees, including Borquez, provided ATM servicing to Chase under a written agreement between Brink's and Chase. On the morning in question, Borquez and his co-worker, Albert Aguirre, arrived at the branch in a Brink's armored truck to replenish the cash in the branch's two outdoor ATMs. Aguirre, who was driving, parked the truck near one of the ATMs and remained inside. Borquez stepped out of the truck and proceeded to service the ATM, which involved opening the machine and loading it with cash. As Borquez performed this work,

---

[1] Also, the record shows the branch was formerly known as the "North Oak Cliff Banking Center" and is referred to as such in several documents in the record.

Enrique Lopez approached on foot from the direction of a nearby bus stop and entered onto the branch's exterior premises by crossing a narrow landscaped strip that bordered the branch's parking lot. Lopez placed a gun to Borquez's head. Borquez turned, pushed Lopez away, and drew his own gun. Lopez shot Borquez twice, then fired at the Brink's truck before fleeing in a waiting car with another man, later identified as Jesus Sandoval. Borquez was pronounced dead at the scene.

Plaintiffs filed this lawsuit on December 1, 2009, against Brink's, Chase, Lopez, and Sandoval.[2] In their last-filed petition at the time of trial, plaintiffs' claims against Chase included, in relevant part, "negligence/gross negligence," premises liability "by invitee,"[3] and wrongful death and survival claims. Specifically, as to "negligence/gross negligence," plaintiffs asserted in part (1) certain "actions/omissions" were committed by Chase[4] and (2) "[t]he risk to Mr. Borquez was foreseeable in light of what [Chase] knew or should have known before his death occurred given the violent crime history at the [Chase] location; [Chase's] own ATM survey both of which conveyed an extremely high crime risk at the location made the subject of this lawsuit; the absence of any security guard at the [Chase] facility; and the nature of the

---

[2] Prior to trial, plaintiffs agreed to dismiss their claims against Brink's with prejudice. Further, the jury found no liability against Lopez or Sandoval. Brink's, Lopez, and Sandoval are not parties to this appeal.

[3] The parties did not dispute in the trial court, and do not dispute on appeal, that at the time of the events in question, Borquez was an "invitee" as to the premises.

[4] According to plaintiffs, those "actions/omissions" included, but were not limited to, the following: (1) "[Chase] failed to provide and disclose information that would have been beneficial to the 'guard' team assigned to their ATM machines, including but not limited to the occurrence of prior armed robberies on the premises; that [Chase] had no onsite security guard to perform protective surveillance for the individual servicing the ATM; and that such a guard was required while Borquez was working on the ATM due to the extremely vulnerable and dangerous position such service created"; (2) "[Chase] failed to provide proper directions or requirements for protection of messengers"; (3) "[Chase] failed to take any action to provide security procedures for the protection of the ATM users/servicers who were determined to be at high risk, including but not limited to failing to provide a guard to survey the surrounding area, during the time the ATM servicer was servicing the machine, and could not observe the surrounding area behind the servicer of the ATM, such as Mr. Borquez, while performing such service on the ATM"; (4) "[Chase] failed to instruct Brink's to utilize a three (3) person Brink's team given the risk at its location, which [Chase] knew did not have a security guard working at the location who would provide the required surveillance during the time the ATM was serviced"; (5) "[Chase] failed to require a three (3) person Brink's team given the risk at its location and the nature of the ATM services [Chase] required"; and (6) "[Chase] failed to develop and provide proper security procedures for the servicing of the ATM that would ensure its facility was safe during the time the ATM was serviced."

services [Chase] requested be performed by individuals in Borquez's position when servicing the ATM." Additionally, as to premises liability, plaintiffs contended in their live petition,

> The lack of adequate security at [Chase's] premises posed an unreasonable risk of harm. [Chase] knew or reasonably should have known of the same. [Chase] had a duty to use ordinary care to ensure that the premises did not present a danger to [Borquez]. [Chase] breached the duty of ordinary care. [Chase's] breach of duty . . . proximately caused the death of [Borquez].

Chase filed a general denial answer and asserted several "affirmative defenses." Those "affirmative defenses" included, in part, "[t]he damages sought by Plaintiffs were the result of the criminal acts of one or more third parties, who were not under [Chase's] control, which were not the foreseeable result of any negligence by [Chase]."

A jury trial commenced on September 10, 2013. At trial, Ricardo Bernal testified he was employed by Chase as an assistant branch manager at the Stevens Park branch for a period of approximately four years ending in 2010. According to Bernal, the branch first opened in 2005. Bernal stated he was present during a robbery at the branch that occurred on February 25, 2006, at approximately 12:58 p.m. A February 26, 2006 Chase internal document titled "Global Security & Investigations Executive Summary" was admitted into evidence and shown to the jury. That executive summary stated in part, (1) "[a]n employee of the branch assisting a customer outside the branch was approached by an armed robber, forced back into the branch, and ordered by the robber to fill a bag with cash"; (2) "[w]hile the merchant teller was complying, the robber pointed a handgun at employees and customers and told them all to get to the floor," then "demanded cash from two additional tellers"; (3) "[a] weapon was displayed and no injuries were reported"; and (4) "Consumer Bank Security reviewed the circumstances related to this robbery and the recent incident history at this location and within the market" and "[b]ased on this review, additional security enhancements are not warranted at this time." According to Bernal, the February 25, 2006 "event" took place "out at the ATM." He stated that

after that incident, "the bank hired a state trooper for about two weeks" who was at the branch during operating hours.

Further, Bernal testified he was present when a second robbery occurred at the Stevens Park branch on August 11, 2006, during the bank's business hours. An August 11, 2006 Chase executive summary respecting that robbery was admitted into evidence and shown to the jury. That document stated (1) "[f]our robbers with hoods over their faces and guns drawn entered the branch" and made verbal demands for money; (2) the robbers departed the bank suddenly without any currency; (3) "[a]lthough weapons were displayed and pointed around no injuries were reported"; and (4) "Global Corporate Security reviewed the circumstances related to this robbery and the recent history at this location and within the market" and "[b]ased on this review, an off-duty police officer has been assigned to the branch and installation of B/R glass is being pursued." Bernal stated that after that robbery, the bank "provided another trooper for a couple of weeks" and "added bullet-resistant glass" in front of the teller stations inside the bank.

Also, Bernal testified he was present at the Stevens Park branch on the day Borquez was killed. Bernal stated that after that incident, the bank provided a guard at the branch for about two weeks. He testified that in his opinion, a person using the outdoor ATM on September 18, 2009, needed "additional protection" because "[a]fter that day it—it opened my eyes to a lot." Further, he stated he "would have liked to have seen a guard" at the branch in September 2009 because it would have made him "feel secure."

On cross-examination, Bernal testified that on February 25, 2006, he did not "personally see" the robber's first contact with the bank employee during the incident described above and could not tell the jury from "his own personal knowledge" where the robber first approached the bank employee. Additionally, Bernal stated he is not aware of any robbery at the Stevens Park

branch between the August 11, 2006 incident described above and the 2009 crime against Borquez.

Among the documents admitted into evidence at trial were pages from four reports prepared for Chase by GMR Protection Resources, Inc. (the "GMR reports").[5] Each report was titled "Incidence of Crimes of Violence—By Area—By Address" for a specific "reporting period." The reporting periods for the four GMR reports were (1) January 2005 through December 2005, (2) January 2006 through December 2006, (3) January 2007 through December 2007, and (4) January 2008 through December 2008.

The portion of the 2005 GMR report introduced into evidence consisted of page 253 of that report. That page listed eight "site addresses," including the address of the Stevens Park branch. For each of those "site addresses," the report showed (1) the number of aggravated assaults, homicides, rapes, and robberies at that "site" and (2) the number of each of those same four types of crimes in the "area." As to the Stevens Park branch, the 2005 GMR report showed (1) no crimes on the site and (2) "area" crimes consisting of thirty-five aggravated assaults, zero homicides, six rapes, and fifty-five robberies. The number of "area" robberies listed for the Stevens Park branch was the highest number among the eight sites listed on page 253.

As to the 2006, 2007, and 2008 GMR reports, a single, unnumbered page from each report was introduced into evidence. Each of those pages (1) contained the heading "City of Dallas"; (2) listed thirty-seven "site addresses," including the address of the Stevens Park branch; and (3) provided "site" and "area" statistics for the same four crimes described above. As to the Stevens Park branch, (1) the 2006 GMR report showed no crimes on the site and "area" crimes consisting of thirty aggravated assaults, one homicide, one rape, and thirty-eight robberies;

_____

[5] Identical copies of the pages of the GMR reports introduced into evidence were contained in two of plaintiffs' trial exhibits, Exhibit 149 and Exhibit 245.

(2) the 2007 GMR report showed no crimes on the site and no "area" crimes; and (3) the 2008 GMR report showed no crimes on the site and "area" crimes consisting of fifteen aggravated assaults, zero homicides, three rapes, and thirty-three robberies. In the 2006 GMR report, four sites listed on the page had a higher number of "area" robberies than the number shown for the Stevens Park branch. In the 2008 GMR report, the number of "area" robberies shown for the Stevens Park branch—thirty-three—was the highest among the thirty-seven sites listed on the page. The next highest number of "area" robberies for any other site on that page was twenty-six.

Another document admitted into evidence was a printout of a February 13, 2009 online Dallas Morning News article titled "Armed Robbers Hit ATM Outside Bank in Red Bird Area." The article stated that at approximately 10:45 a.m. on that date, two men robbed a Loomis armored car guard outside of a Bank of America branch in the 3300 block of West Camp Wisdom Road in southern Dallas. Specifically, according to the article, (1) "[t]he guard was getting ready to load money into an ATM when a robber put a gun to the back of his head," (2) the two robbers fled with the guard's gun and an undisclosed amount of money, and (3) no one was injured. Also, a February 13, 2009 Dallas Police Department "Robbery Bulletin" respecting that same incident was admitted into evidence. That bulletin stated in part that during a robbery that morning, "the listed suspects approached a Loomis Armored Car Guard as he approached the ATM at the Bank of America, located at 3309 W Camp Wisdom Rd, Beat 456, in Dallas," placed a gun to the guard's head, and took the guard's weapon and the bank bag he carried.

John Bonham testified he is a police research specialist for the Dallas Police Department. He stated that in connection with this trial, he was asked by plaintiffs to prepare "official crime statistics." According to Bonham, (1) the Stevens Park branch is in "sector 410, beat 415" and

(2) he prepared statistics showing the incidence of various categories of crime in that sector, that beat, and citywide. The categories of crime included, in part, "robbery–business." An exhibit containing those crime statistics was introduced and admitted into evidence. The exhibit (1) consisted of a single page with three charts showing the number of each type of crime in the beat, sector, and city for the years 2006 through 2009 and (2) showed that the number of "robbery–business" crimes in beat 415 was nine in 2006, six in 2007, nine in 2008, and nine in 2009. Further, Bonham testified (1) the police department breaks the city of Dallas down into "beat areas" based on "call load and offense," (2) "the size of the beats are different," (3) "[s]ectors are just bigger sets of the beats," (4) sector 410 is "like north of Jefferson and south of I-30 and runs from basically I-35 over to about Cockrell Hill Road," (5) any statistics showing zero offenses for beat 415 in 2007 or 2008 would be incorrect, and (6) crime statistics compiled by the Dallas Police Department and updated daily are available to the public through an online service. On cross-examination, Bonham stated he did not know how many of the "robbery–business" crimes shown to have occurred in beat 415 were bank robberies.

Kevin Preola testified he is employed by Chase as "regional security manager with corporate security" and is "the corporate representative for [Chase] in this lawsuit." On direct examination, Preola stated in part (1) GMR was hired by Chase to prepare the GMR reports described above for branches with "external ATMs" because those reports are required by "Texas law"; (2) the 2006 GMR report is wrong to the extent that it shows the number of crimes at the Stevens Park site as being zero, (3) he does not know the size of the "beat area" used in the GMR reports, (4) the "area" crime numbers for the Stevens Park branch in the GMR reports do not match the crime numbers in the "beat 415" report prepared by Bonham described above, (5) he does not know if he was aware in February 2009 of the robbery described above involving

a Loomis guard in the "Red Bird area," and (6) it is his "understanding" that "[w]e owe our customers and vendors to take measures to protect them on our property."

On cross-examination, Preola testified (1) Chase has no record of violent incidents at the Stevens Park branch other than the two 2006 robberies described above and the incident in this case and (2) he is not aware of any violent incidents involving a Brink's guard at any Chase bank branch in the region other than the incident in this case. Additionally, Preola stated on cross-examination as follows:

Q. . . . [D]o you categorize your branches for risk of robbery?

A. We do.

Q. And how do you categorize the Stevens Park Branch?

A. We categorize it as a high because it has been robbed twice.

Q. And so what did you do in response to categorizing it as a high?

A. We put in bullet-resistant glass in the lobby.

Q. Okay. And have you had instants [sic] of bank robbery since that time?

A. No.
. . . .
Q. How does Chase's security—let me back up. Is the branch—after the bullet-resistant glass was installed, is the branch still categorized as high risk?

A. Yes. Once it hit that threshold, we left it at that threshold.

Q. And how does the security at Stevens Park Branch compare to security at comparable branches with Chase or other peer banks?

A. Very comparable with the packages we talked about, alarms and cameras and all the other things we mentioned. The difference here, of course, is bullet-resistant glass because of the lobby robberies. A number of our branches have bullet-resistant glass based on history.

Further, on re-direct examination, Preola testified that since 2006, the Stevens Park branch has been "on the highest rating level for risk."

David Eldredge, a private investigator and "personal protection officer," testified as an expert witness for plaintiffs. Eldredge stated he was asked by plaintiffs' counsel to review certain documents in this case, form an opinion respecting "what was done right and what was done wrong," and "assess the risk that was undertaken." The documents he reviewed included, in part, the GMR reports and Dallas Police Department crime statistics described above. Also, Eldredge stated he was "familiar" with the two 2006 robberies at the Stevens Park branch and the February 13, 2009 robbery of a Loomis guard at a Bank of America in the "Red Bird area" of Dallas described above. Eldredge testified "precautions" were needed at the Stevens Park location because "you have a—a neighborhood in that beat that's got a lot of crime that's going on. . . . So the likelihood of a company like Chase, being in the business that they're in, banking, money, then I think you should be able to foresee the likelihood of you being a crime victim goes up and that you should take precautions to harden or protect assets, as well as protect your customers, your employees, and the general public."

On cross-examination, Eldredge stated, in part, as follows:

Q. You testified that you looked at the crime stats for the area around [the Stevens Park] branch.

A. Yes.

Q. And you thought those crime stats showed a high degree of crime in that particular neighborhood?

A. For the beat and for the sector, yes, sir.

Q. What is the size of that beat; how many square miles?

A. I don't know right now.

Q. What's the size of the sector; how many square miles?

A. Well, the whole sector is fairly good size. That's about the Southeast Patrol Division—I mean the Southwest Patrol Division. I don't know the—the geographical size.

–10–

Q. Okay. And you don't know the geographical size of the beat, right?

A. Well, you know, a beat would be the smallest area. But I—I cannot tell you off the top of my head, no, sir.

. . . .

Q. Now, the crime stats that [counsel for plaintiffs] showed you from GMR, where—where on the beat did those various crimes take place?

A. I don't recall looking at that.

Further, Eldredge testified (1) the "area" crimes listed in the GMR reports "probably" took place somewhere in the police beat encompassing the Stevens Park branch, (2) he does not know where in that beat any of the "area" crimes on the GMR reports took place, (3) a crime within the same beat would not be "miles away" because a beat would not be that large, and (4) after February 2009, Chase "should have been aware that there were guys out there targeting armored cars."

Following plaintiffs' presentation of evidence,[6] Chase filed a motion for directed verdict. In that motion, Chase stated in part (1) "[t]he foreseeability of an unreasonable risk of criminal conduct is a prerequisite to imposing a duty of care on a premises owner to protect others from the risk" (citing *Timberwalk Apts. Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998)); (2) "[i]n order to recover on their negligence, gross negligence, wrongful death, survival, and premises liability claims against Chase Bank, Plaintiffs must prove that Mr. Borquez's murder was reasonably foreseeable"; (3) "the plaintiffs have produced no evidence of duty for their negligence and their negligence-based claims, including the premises liability claim"; and (4) "[w]hether such a duty exists is a question of law for the court." Specifically, the grounds asserted by Chase in its motion included, in part, (1) "[t]here is no evidence that Mr. Borquez's death was reasonably foreseeable to Chase" and (2) "the evidence conclusively establishes that

---

[6] In addition to the evidence described above, plaintiffs presented testimony of several other witnesses on matters not relevant to this appeal, including damages.

–11–

Mr. Borquez's death was not reasonably foreseeable to Chase." Further, during a hearing on that motion outside the jury's presence, counsel for Chase stated in part (1) "[t]he evidence of the 2006 robberies is too remote in time as a matter of law to lead to a finding of foreseeability with respect to Chase"; (2) "[t]he plaintiffs have failed to show sufficient recency, frequency, or similarity of those 2006 crimes to the crime in 2009 to lead any reasonable jury to find that the 2009 crime was foreseeable"; and (3) "with respect to the crime stats in the possession of Chase, the plaintiffs have failed to provide any evidence that that—those crimes were related to, similar to, or in any way would lead to a finding of foreseeability on the part of Chase."

Plaintiffs filed a response to Chase's motion for directed verdict in which they stated in part (1) "[f]actors such as proximity, frequency, similarity, and publicity of past criminal conduct guide courts in determining whether similar conduct in the future is foreseeable such that premises owner has duty to protect invitees from criminal acts by third parties, although owner has no direct knowledge that criminal conduct is imminent, but factors [sic] are not the only reasons that a criminal act might be deemed foreseeable" (citing *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762 (Tex. 2010)); (2) "[w]hether facts establish criminal activity was foreseeable, thereby giving rise to [Chase's] duty is a question of fact, for the fact finder"; and (3) "[t]he evidence that Borquez's death by gunshot was reasonably foreseeable abounds." According to plaintiffs, that evidence included, in part, "[t]he high crime in the surrounding area," "prior armed robberies at the same location," "[o]ther robberies at other locations," and "[p]laintiffs' experts' testimony regarding the nature of the target, ATM, the knowledge that it is certain to attract a criminal element." Additionally, plaintiffs (1) cited section 59.308 of the Texas Finance Code,[7] which is part of a subchapter of that code titled "Safety at Unmanned

---

[7] Section 59.308 requires owners of unmanned teller machines to, among other things, (1) "evaluate the safety of each unmanned teller machine" and (2) "consider . . . the incidence of violent crimes in the immediate neighborhood of the machine as shown by local law enforcement records and of which the owner or operator has actual knowledge." *See* TEX. FIN. CODE ANN. § 59.308 (West 2013).

Teller Machines," and (2) contended in part that "the evidence of the statute itself . . . is evidence the jury can take into consideration in determining Chase's common law negligence." Further, during the hearing on Chase's motion for directed verdict, counsel for plaintiffs stated in part that the evidence respecting foreseeability included (1) "the 2006 very dangerous incidents"; (2) "the failure to act or require correct criminal statistics, much less even act on the criminal statistics provided by GMR which still showed this bank to be the highest—the highest bank in terms of crime"; and (3) Preola's testimony that the branch was "rated the highest in terms of risk available in the Chase system."

The trial court stated it would "reserve its decision" on Chase's motion for directed verdict. Then, the jury returned to the courtroom and Chase presented its evidence.

Luis Gonzalez testified he was employed by Chase as a "personal banker" at the Stevens Park branch from December 2005 until approximately 2008. He stated the branch was robbed in February 2006 and he was present during that robbery. According to Gonzalez, (1) he went outside the bank to help a customer use the ATM; (2) he was not confronted by the robber while he was at the ATM with the customer; and (3) he encountered the robber outside the front doors of the branch as he was walking back inside.

On cross-examination, Gonzalez testified that during the February 2006 robbery, the robber (1) "pushed" a gun into Gonzalez's stomach and told him in Spanish to go inside the bank and "fill this bag with all the money"; (2) stated a bomb had been placed outside the bank; and (3) asked Gonzalez, "Where is the police officer?" Gonzalez told the robber there was no police officer in the bank. Then, both Gonzalez and the robber went inside the bank. Gonzalez testified the robber stepped into the customer line. Gonzalez went to the back of the bank and told the assistant manager the bank was being robbed. He stated the assistant manager filled the bag with currency and a "track pack" and gave it to the robber.

–13–

Further, Gonzalez testified he was present at the Stevens Park branch when the August 2006 robbery described above occurred. According to Gonzalez, "Some gentlemen walked into the branch holding weapons in the air. Pretty much everyone hit the floor. And then they went to a teller line and asked for money." On re-direct examination, Gonzalez testified nobody was injured during either of the 2006 robberies.

Glade Michael Ross testified he is owner of GMR. He stated as follows as to the GMR reports described above:

Q. Do you prepare these types of reports for Chase Bank?

A. Yes.

Q. Why do you do that?

A. The Texas ATM User Safety Act does require that owners and operators of unmanned teller machines contact local law enforcement to obtain records of violent crime at their location and in the immediate neighborhood. We simply gather the information as required by the statute and give it to the client. We do not analyze it.
. . . .
Q. Where do you get your crime data?

A. From the various individual law enforcement agencies that we contact.

Q. When you request a crime data, how do you request it?

A. We typically request it for the specific address—and it's for four types of crimes—and then in the immediate neighborhood. So we actually request it in two forms. One is by the address, and then the other is the immediate neighborhood.
. . . .
Q. Who then defines immediate neighbor [sic]?

A. Generally it's local law enforcement. We have no way to define that.

Q. So what—what do you—what does GMR specifically tell local law enforcement? How is it worded?

A. We're requesting in those words, immediate neighborhood.
. . . .
Q. You said you gathered information on four types of crime. What are those types of crime?

A. Robbery, aggravated assault, homicide, and rape.

Q. Why do you request those specific categories?

A. In the absence of any direction in the statute, it does reference violent crimes. So the FBI considers those Part 1 crimes. That's the basis that we utilize in— those are four Part 1 crimes.

Tase Bailey was called by Chase as an expert witness. Bailey testified he is employed by Ben C. Nix & Associates, which conducts private investigations. According to Bailey, Lopez (1) committed the February 2009 armed robbery of a Loomis guard at a Bank of America branch described above, (2) did not shoot anyone during that robbery, (3) stole the Loomis guard's gun and later used it to kill Borquez, and (4) pleaded guilty to bank robbery respecting the crime involved in this case.

Following Bailey's testimony, Chase rested its case. On rebuttal, plaintiffs called Morris McGowen as an expert witness. McGowen stated he is a partner in a consulting firm and specializes in security. On direct examination, he testified in part that the two 2006 robbery incidents at the Stevens Park branch constituted "criminal activity, violent criminal activity, that potentially occurred on the premises." Further, McGowen stated as follows:

Q. And given that there was violent criminal activity on [Chase's] premises, what does that tell you about the future?

A. It could be predicted that you could continue to have violent activity.

Q. Is it predictive?

A. In my opinion, yes, sir, it could be.

Q. And that type of activity, when you have a bank robbery with guns, does that tell you in the future you need to prepare for that type of assault?

A. Yes, sir.

Q. On the premises?

A. Yes, sir.

After the parties' presentation of evidence, the trial court held a "formal charge conference" outside the jury's presence. The trial court granted Chase's motion for directed verdict, in part, as to several claims not relevant to this appeal[8] and otherwise denied that motion. Then, the trial court addressed the parties' objections to the charge of the court.[9] Chase's objections to the charge included, in part, an objection to question number one because (1) "there is no evidence to support its submission to the jury"; (2) "[t]here is no evidence of foreseeability, and that element is precluded as a matter of law"; (3) "Mr. Borquez's death was not reasonably foreseeable as a matter of law"; and (4) "[Chase] owed no duties to Plaintiffs or Mr. Borquez as a matter of law." Additionally, Chase made substantially similar objections to question number four. Chase's objections to the charge of the court were overruled.

---

[8] Specifically, Chase's motion for directed verdict was granted as to plaintiffs' (1) claim for "negligence per se" based on alleged violation of the Texas Finance Code and (2) "attractive nuisance claims."

[9] The charge of the court contained, in part, the following definitions and questions:

"Negligence," means failure to use ordinary care that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

. . . .

"Proximate cause" means a cause, unbroken by any new and independent cause, that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

. . . .

QUESTION 1:

Did the negligence, if any, of those named below proximately cause the injury and/or death in question?

    Answer "Yes" or "No" for each of the following:
a. Chase Bank
b. Enrique Lopez
c. Jesus Sandoval
d. Cresencio Borquez

. . . .

QUESTION 4:

Did the negligence, if any, of those named below proximately cause the injury and/or death in question?

With respect to the condition of the premises, Chase Bank was negligent if

    1. the condition posed an unreasonable risk of harm, and
2. Chase Bank knew or reasonably should have known of the danger, and
3. Chase Bank failed to exercise ordinary care to protect Cresencio Borquez from the danger, by both failing to adequately warn Cresencio Borquez of the condition and failing to make that condition reasonably safe.

"Ordinary care," when used with respect to the conduct of Chase Bank as an owner or occupier of a premises, means that degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances.

    Answer "Yes" or "No" for each of the following:
a. Chase Bank
b. Enrique Lopez
c. Jesus Sandoval
d. Cresencio Borquez

The jury answered "yes" as to Chase in questions number one and four of the charge of the court and found Chase 100% liable for Borquez's injury and death. The damages found by the jury totaled $4 million.

Chase filed a motion for judgment notwithstanding the verdict and to disregard certain jury answers. In that motion, Chase contended in part "there was no evidence to support the submission of question 1 to the jury" because (1) "[a]t trial it was conclusively established that Chase Bank was not negligent as a matter of law"; (2) "Plaintiffs provided no legally sufficient evidence to support their contentions that Mr. Borquez's death could have been foreseeable to Chase Bank, . . . or that Chase Bank had a duty to Mr. Borquez"; (3) "[a]s a matter of law, Chase Bank owed no duty to Plaintiffs or Mr. Borquez under any theory"; (4) "there is no evidence of proximate cause"; and (5) "the evidence demonstrates that Mr. Borquez's death was not reasonably foreseeable as a matter of law." Additionally, Chase asserted in part that "the jury's finding in response to charge question 4 cannot stand" because (1) "Chase Bank is not liable for premises liability or for any damages for premises liability as a matter of law"; (2) "[question number four] regarding negligence with respect to premises liability should never have been submitted to the jury because there was no evidence to support the submission . . . and the evidence conclusively established that Chase Bank was not negligent as a matter of law"; (3) "there was no evidence presented at trial to support a finding that Chase Bank owed any duty to Mr. Borquez"; (4) "Chase Bank owed no duty to Plaintiffs or Mr. Borquez as a matter of law"; and (5) "there was no evidence that Mr. Borquez's death was reasonably foreseeable as a matter of law."

Plaintiffs responded in part (1) "[w]hether facts establish criminal activity was foreseeable, thereby giving rise to [Chase's] duty, was a question of fact for the jury"; (2) "[t]he jury heard the evidence and the jury determined the actions of Lopez were foreseeable"; and

–17–

(3) "[s]ufficient evidence existed for the jury to render that verdict." Further, during the hearing[10] on Chase's motion for judgment notwithstanding the verdict and to disregard certain jury answers, counsel for plaintiffs stated in part,

> [T]he negligence questions were supported by the facts and the law that Chase Bank did commit negligence. And that was underscored by the three liability experts that plaintiffs called, along with the facts obtained from Chase's own corporate rep, Kevin Preola, Chase's Mr. Mike Ross, who Chase called from GMR, and the Dallas Police Department statistical person that testified about the stats and the availability of the stats online.
> . . . The two robberies in—violent robberies in 2006, along with the crime statistics that the Dallas Police Department brought forward for the high crime— very high crime in the area, along with Chase's testimony that it specifically excluded any analysis or consideration of those high crime stats all create liability for Chase and create knowledge for Chase. Even Chase's own internal records, based on the GMR stats, which were totally inadequate, pointed out that this bank, the Oak Cliff branch that we're here about, was the highest crime branch of any outdoor ATM operated by Chase. Chase was also on knowledge of the February 2009 ATM robbery that occurred of a Loomis vehicle and the same and similar facts and turned out to be the same assailants that attacked Mr. Borquez and caused his death. So I think all of that certainly supports the findings. The law supports the submission of the questions.

The record is silent as to the specific disposition of Chase's motion for judgment notwithstanding the verdict and to disregard certain jury answers.

The trial court's judgment described above is dated February 21, 2014. Chase filed a timely motion for new trial in which it asserted, *inter alia*, substantially the same arguments described above. That motion was overruled by operation of law. This appeal timely followed.

---

[10] At that hearing, the trial court requested that Chase "provide the relevant references to the parts in the record that you believe supports your motion." Subsequently, Chase filed a supplemental motion for judgment notwithstanding the verdict in which it (1) objected to the trial court's request for evidentiary cites because "there is no requirement that a party must cite to the record in a JNOV motion" and (2) stated that it "reserves its right to cite additional evidence on appeal to support this supplemental Motion for JNOV, if necessary." Chase's supplemental motion contained substantially the same arguments as its initial motion, plus general citations to several multi-page portions of trial testimony, including portions of the testimony of Preola, Gonzales, and the parties' experts described above. Plaintiffs filed a response to Chase's supplemental motion in which they contended the testimony cited by Chase did not support Chase's arguments.

## II. DUTY

### *A. Standard of Review*

"When material facts are undisputed, the existence of a duty is a question of law that only the court is entitled to answer." *QuikTrip Corp. v. Goodwin*, 449 S.W.3d 665, 670 (Tex. App.—Fort Worth 2014, pet. denied) (citing *Boerjan v. Rodriguez*, 436 S.W.3d 307, 310 (Tex. 2014), and *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009)); *accord Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002); *Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 395 (Tex. 1991). "Our review of a decision of a question of law is de novo." *Murphy v. Gruber*, 241 S.W.3d 689, 692 (Tex. App.—Dallas 2007, pet. denied) (citing *Barber v. Colo. Indep. Sch. Dist.*, 901 S.W.2d 447, 450 (Tex. 1995)).

### *B. Applicable Law*

A cause of action for negligence in Texas requires three elements: a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach. *See, e.g.*, *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002). The initial burden of proof for each element of a negligence cause of action is on the plaintiff. *See, e.g.*, *Nelson v. Krusen*, 678 S.W.2d 918, 929 (Tex. 1984); *Jonah Water Special Util. Dist. v. White*, No. 03-06-00626-CV, 2009 WL 2837649, at *7 (Tex. App.—Austin Aug. 31, 2009, pet. denied) (mem. op.) (citing *Hager v. Romines*, 913 S.W.2d 733, 735–36 (Tex. App.—Fort Worth 1995, no writ)); *see also Abalos v. Oil Dev. Co. of Tex.*, 544 S.W.2d 627, 631 (Tex. 1976) (plaintiff claiming negligence must prove the existence and violation of a legal duty owed to him by the defendant to establish liability).

Premises liability is a special form of negligence in which the duty owed to the plaintiff, if any, depends on the status of the plaintiff as an invitee, licensee, or trespasser. *QuikTrip Corp.*, 449 S.W.3d at 670; *see Maldonado v. Sumeer Homes, Inc.*, No. 05-12-01599-CV, 2015

WL 3866561, at *2 (Tex. App.—Dallas June 23, 2015, no pet.) (mem. op.). In a premises liability case, "the plaintiff must establish a duty owed to the plaintiff." *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010). "If no duty exists, then no liability for a premises liability claim can arise." *QuikTrip Corp.*, 449 S.W.3d at 670; *accord Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 217 (Tex. 2008).

"As a rule, a person has no legal duty to protect another from the criminal acts of a third person." *Timberwalk Apts. Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998). An exception is that "[o]ne who controls . . . premises does have a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee." *Id*. (quoting *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 53 (Tex. 1997)); *see also Del Lago Partners*, 307 S.W.3d at 767. Foreseeability (1) "means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others," *Nixon v. Mr. Prop. Mgm't Co.*, 690 S.W.2d 546, 549–50 (Tex. 1985), and (2) "requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable," *Timberwalk*, 972 S.W.2d at 756. "In determining whether the occurrence of certain criminal conduct on a landowner's property should have been foreseen, courts should consider whether any criminal conduct previously occurred on or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct on the property, and what publicity was given the occurrences to indicate that the landowner knew or should have known about them." *Id*. at 757; *see also Park v. Exxon Mobil Corp.*, 429 S.W.3d 142, 145 (Tex. App.—Dallas 2014, pet. denied) ("These factors have come to be known as 'the *Timberwalk* factors.'"). "The court must weigh the evidence using all the factors." *Timberwalk*, 972 S.W.2d at 759.

Additionally, the supreme court stated in *Timberwalk* as follows: (1) "[w]hen the 'general danger' is the risk of injury from criminal activity, the evidence must reveal 'specific previous crimes on or near the premises' in order to establish foreseeability," *id.* at 756; (2) "[w]hether such risk was foreseeable must not be determined in hindsight but rather in light of what the premises owner knew or should have known before the criminal act occurred," *id.* at 757; (3) "[f]or a landowner to foresee criminal conduct on property, there must be evidence that other crimes have occurred on the property or in its immediate vicinity," *id.* (citing *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996)); and (4) "[t]he previous crimes must be sufficiently similar to the crime in question as to place the landowner on notice of the specific danger," *id.* at 758.

Further, the supreme court has stated that the *Timberwalk* factors "are not the only reasons that a criminal act might be deemed foreseeable." *Del Lago Partners*, 307 S.W.3d at 768. In *Del Lago Partners*, the plaintiff and a group of his friends visited a bar at a large resort. *Id.* at 764. Hostilities arose between the plaintiff's group and another group at the bar and grew more severe as the night went on. *Id.* The confrontations involved intoxicated patrons and "recurred throughout a ninety-minute period." *Id.* At closing time, a fight broke out, involving an estimated twenty to forty men. *Id.* at 766. When the plaintiff entered the fight to remove a friend who had a heart condition, he was attacked and suffered a skull fracture and brain damage. *Id.*

In a holding the supreme court described as "narrow and fact-specific," that court stated in part as follows:

> The nature and character of the premises can be a factor that makes criminal activity more foreseeable. In this case, the fight occurred in a bar at closing time following ninety minutes of heated altercations among intoxicated patrons. . . . [A]s common sense dictates, intoxication is often associated with aggressive behavior. . . .
> More generally, criminal misconduct is sometimes foreseeable because of immediately preceding conduct. . . . As we have recognized, when a property owner "by reason of location, mode of doing business, or observation or past

–21–

experience, should reasonably anticipate criminal conduct on the part of third persons . . . [the owner] has a duty to take precautions against it.". . . .

. . . .

We hold that Del Lago had a duty to protect [the plaintiff] because Del Lago had actual and direct knowledge that a violent brawl was imminent between drunk, belligerent patrons and had ample time and means to defuse the situation. Del Lago's duty arose not because of prior similar conduct but because it was aware of an unreasonable risk of harm at the bar that very night. . . .

. . . .

We do not announce a general rule today. We hold only, on these facts, that during the ninety minutes of recurrent hostilities at the bar, a duty arose on Del Lago's part to use reasonable care to protect the invitees from imminent assaultive conduct. The duty arose because the likelihood and magnitude of the risk to patrons reached the level of an unreasonable risk of harm, the risk was apparent to the property owner, and the risk arose in circumstances where the property owner had readily available opportunities to reduce it.

*Id*. at 768–70 (citations omitted).

### *C. Analysis*

In its first issue, Chase contends the trial court reversibly erred by submitting appellees' claims to the jury because Chase "owed no duty to Borquez as a matter of law." According to Chase, the "two prior incidents at the branch" and/or the evidence respecting "area crimes" did not "make Mr. Borquez's death reasonably foreseeable to Chase" and were "insufficient to have conferred a duty on Chase as a matter of law." Additionally, in its reply brief in this Court, Chase asserts (1) *Del Lago Partners* is "inapposite" and (2) this Court's recent opinion in *Park*, which appellees do not cite or address, is "dispositive" and requires that the judgment in this case be reversed and rendered.

Appellees respond in part that Chase owed a duty to "protect invitees like Cresencio Borquez from the criminal acts of third parties on its branch premises" because "Chase could have reasonably foreseen the attempted armed robbery on its premises that resulted in Borquez's death." Specifically, appellees argue (1) the "general danger that Chase had to foresee" was "the danger of injury from violent crimes on the premises," not "Borquez's death"; (2) "the location, nature, character, and past experiences of Chase's branch and ATM operation were such that it

'should reasonably anticipate criminal conduct on the part of third persons'"; and (3) "[t]he *Timberwalk* factors also establish foreseeability." In support of those arguments, appellees cite (1) several sections of the finance code subchapter described above titled "Safety at Unmanned Teller Machines"; (2) portions of the evidence described above pertaining to the two 2006 robbery incidents at the Stevens Park branch, the February 2009 robbery of a Loomis armed guard at a Bank of America, the GMR reports, and the Dallas Police Department crime statistics compiled by Bonham; (3) Preola's testimony that the Stevens Park branch was categorized as a "high" risk for robberies, that it remained in that category at the time of the events in question, and that it is his "understanding" that "[w]e owe our customers and vendors to take measures to protect them on our property"; and (4) portions of testimony of Eldredge and Ross described above.

As a threshold matter, we begin by addressing the parties' arguments respecting the "danger" that had to be foreseeable in order for a duty to exist in this case. *See Timberwalk*, 972 S.W.2d at 756. As described above, Chase contends foreseeability of "Borquez's death" was required, while appellees argue a duty existed because Chase could foresee "the danger of injury from violent crimes on the premises." The danger described by appellees is broader and more general than the danger described by Chase and thus requires less specificity in showing foreseeability. However, we need not decide whether, as argued by Chase, foreseeability of the more specific danger of "Borquez's death" was required. Even assuming, without deciding, that the existence of a duty in this case required foreseeability of only the more general "danger of injury from violent crimes on the premises," our analysis below leads us to conclude such danger was not foreseeable. *See, e.g.*, *QuikTrip Corp.*, 449 S.W.3d at 677 (concluding victim's rape and murder, or even a violent and sexual crime generally, were not foreseeable).

We now address the authorities pertinent to this case. First, we consider the *Park* case, in which this Court addressed foreseeability as part of the analysis respecting whether the owner of a gas station had a duty to protect an invitee from a violent crime on its premises. *Park*, 429 S.W.3d at 144. The relevant facts in that case describe that, late one night, Chan Park was on his way home from work at a convenience store he owned. *Id*. He stopped for gas at an Exxon Mobil station in Dallas. *Id*. On the floor of the passenger side of his car was a paper bag containing change and small bills from his store. *Id*. As Park prepared to purchase gas, a man got out of another car and shot him. *Id*. The man then went into Park's car, removed something from the passenger side, and got back into the other car. *Id*. The police found many quarter-dollar coins scattered on the ground at the scene. *Id*.

Park survived his injuries and sued Exxon Mobil for negligence, asserting Exxon Mobil owed a duty to protect him, an invitee, from the foreseeable criminal acts of third parties. *Id*. Park alleged Exxon Mobil knew or should have known of a pattern of criminal activity in the area that posed a foreseeable risk of harm and did not take reasonable steps to prevent the danger. *Id*. Among other things, Park asserted Exxon Mobil was negligent in failing to (1) provide additional security in the parking lot late at night, (2) provide fencing to limit escape routes, and (3) retain a security patrol or a security guard. *Id*. at 144–45. Exxon Mobil filed a traditional and no-evidence motion for summary judgment on the grounds that it owed Park no duty because the incident in question was not foreseeable. *Id*. at 145. The trial court granted that motion.

On appeal to this Court, Park contended in part that the trial court erred because there was a fact issue as to duty respecting whether the crime committed against him was foreseeable. *Id*. This Court began our analysis by considering "foreseeability based on previous crimes and the *Timberwalk* factors." *Id*. at 145–46. This Court (1) observed "there were five instances of

violent crime at or adjacent to the Exxon Mobil station in the two years prior to Park's shooting" and (2) described evidence presented pertaining to the specific location and details of each of those five crimes. *Id*. at 146. Then, this Court addressed the *Timberwalk* factors in turn.

The first of the *Timberwalk* factors considered were "proximity and publicity." This Court stated (1) "[p]roximity means crimes occurring on the property or in its immediate vicinity" and (2) there was no dispute that the five violent crimes described above occurred at or immediately adjacent to the Exxon Mobil station and that Exxon Mobil was aware or should have been aware of them. *Id*. at 147. Additionally, the record showed that Park (1) urged the trial court to consider evidence of "a substantial pattern of major criminal activity" in the area near the Exxon Mobil station and (2) presented evidence that in the three-and-a-half year period immediately preceding the date of the crime against Park, there were a total of 353 violent crimes reported within a one-mile radius of the Exxon Mobil station, including two murders, 160 robberies, and 147 aggravated assaults. *Id*. However, this Court stated "[t]here is no evidence to show any details of these crimes or to show what publicity was given to them to indicate that Exxon Mobil knew or should have known about any of them." *Id*.

Next, this Court considered "recency and frequency." *Id*. As to those factors, this Court stated (1) "[a] criminal act is more likely foreseeable if numerous prior crimes are concentrated within a short time span than if few prior crimes are diffused across a long time span"; (2) "the Exxon Mobil station saw five violent crimes in the twenty-month period preceding Park's shooting, for a rate of one violent crime every 121 days"; and (3) "[n]o violent crimes were committed at the station in the six months before Park's shooting." *Id*.

Finally, in addressing the remaining factor, "similarity," this Court stated (1) "previous crimes need only be sufficiently similar to the crime in question to put the owner on notice of the specific danger," (2) "[c]rimes fitting one category can relate to or result in crimes of another

category," and (3) "a string of violent crimes such as robberies or assaults can make other violent crimes like murder or rape foreseeable." Then, this Court observed (1) four of the five violent crimes described above were robberies; (2) two of those robberies involved suspects robbing the store, not its customers; (3) another of those robberies involved a non-customer on the street adjacent to the gas station; (4) in the robbery of the non-customer and the remaining robbery, which involved a customer, a pocket knife was used and the injuries the victims sustained were minor; and (5) the fifth crime on the property was an assault with a knife after a disagreement between customers. *Id*. at 148. This Court reasoned (1) "[o]nly once in the two years preceding the robbery of Park was a gun used to commit a crime at or adjacent to the gas station"; (2) "in that instance the gun was displayed to a store clerk, not fired"; and (3) "[a]t no time in the preceding two years was anyone shot at the Exxon Mobil station." *Id*. Additionally, in a footnote, this Court stated (1) Park presented evidence that two customers had previously been shot at the Exxon Mobil station in question and (2) those shootings occurred, respectively, four and five years before Park was shot and therefore were "well outside the two-year timeframe" used by the supreme court in two other cases involving foreseeability of third-party crime in a duty analysis. *Id*. at 148 n.3 (citing *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 17 (Tex. 2008) (considering two-year time frame in analyzing duty of premises owner to protect against criminal act of third party), and *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 657 (Tex. 1999) (same)). This Court stated "[t]he supreme court referred to two years as a 'reasonable time' and we agree." *Id*.

After considering the five *Timberwalk* factors as described above, this Court stated as follows:

> [W]e conclude as a matter of law that the aggravated robbery of Park was not foreseeable based on evidence of prior crimes. *Cf. Trammell Crow*, 267 S.W.3d at 17 (ten violent crimes in two years preceding shooting death at mall insufficient to put property owner on notice that murder would occur as part of robbery on

–26–

premises). Regarding the crimes within a one-mile radius of the gas station, there is nothing in the record to show any of those crimes were publicized such that Exxon Mobil should have been aware of them. And the previous crimes at the property were not sufficiently frequent and similar to give rise to a duty in this case.

*Id*. at 148.

Then, this Court considered "other summary judgment evidence" that Park contended raised a fact issue on foreseeability. *Id*. (citing *Del Lago Partners*, 307 S.W.3d at 768). Specifically, Park referred to the following evidence: (1) the fact that the manager of the Exxon Mobil in question had requested security guards; (2) the fact that Exxon Mobil barred its employees from going outside the store late at night; (3) the existence of, and failure to follow, procedures designed to assess the risk of criminal activity; and (4) opinions from two expert witnesses that Park's shooting was foreseeable. As to the first two of those items of evidence, this Court stated in part "[t]he mere act of taking preventive measures to protect against the possibility of future crime is not the same as foreseeing that criminal activity." *Id*. at 149 (citing *Allen v. Connolly*, 158 S.W.3d 61, 67 (Tex. App.—Houston [14th Dist.] 2005, no pet.), and *Trammell Crow*, 267 S.W.3d at 12–13). As to the third item, (1) Park relied on Exxon Mobil's written operating procedures and an Exxon Mobil "site security" program that consisted of guidelines "to help deter and reduce the probability of security incidents"; (2) the provisions of those procedures and guidelines included conducting "security threat assessments" and performing "night ride inspections"; and (3) the evidence showed that the manager of the Exxon Mobil station in question was not aware of any threat assessments or night rides being performed as to that station. *Id*. This Court stated in part, "Assuming these policies and procedures were still in effect at the time of [Park's] shooting, their mere existence does not raise a fact issue on foreseeability." *Id*. Further, this Court reasoned,

> [W]e have concluded that the previous crimes at or in the immediate vicinity of the Exxon Mobil station were not sufficiently frequent and similar to make the

crime against Park foreseeable. Thus, even if Exxon Mobil had followed its procedures for evaluating the risk of criminal activity in the area, there is no reason to believe this would have made the crime against Park foreseeable. Any failure by Exxon Mobil to follow its procedures for assessing the risk of criminal activity at the station does not raise a fact issue on foreseeability.

*Id*.

Finally, as to the two expert opinions offered by Park, (1) "[b]oth experts examined the crime statistics for a one-mile radius around the Exxon Mobil station for the five years preceding Park's shooting, as well as evidence of nine violent crimes committed at the Exxon Mobil in this same timeframe"; (2) one expert "concluded that based on the number of similar violent crimes at the gas station, Exxon Mobil knew or had reason to know there was a foreseeable risk of harm to its customers"; and (3) the second expert "stated in an affidavit that, in his opinion, the crimes committed against Park were reasonably foreseeable." *Id*. at 149–50. This Court stated (1) "[t]he existence of a legal duty is a matter for the court, rather than an expert witness, to decide," and (2) "[e]xpert testimony is insufficient to create a duty where none exists at law." *Id*. at 150 (citing *Boren v. Texoma Med. Ctr., Inc*., 258 S.W.3d 224, 229 (Tex. App.—Dallas 2008, no pet.), and *Allright San Antonio Parking Inc. v. Kendrick*, 981 S.W.2d 250, 255 (Tex. App.— San Antonio 1998, no pet.)). This Court concluded (1) no fact issue on foreseeability had been raised and (2) "Exxon Mobil owed no duty to Park as a matter of law." *Id*.

In accordance with *Park*, our analysis in the case before us begins with consideration of "foreseeability based on previous crimes and the *Timberwalk* factors." *Id*. at 145. The parties' arguments on appeal address the following crimes that occurred prior to Borquez's murder: (1) the two 2006 robbery incidents at the branch, (2) the crimes in the GMR reports and Dallas Police Department crime statistics report, and (3) the February 2009 robbery of a Loomis guard at a Bank of America branch in the "Red Bird" area.

Specifically, Chase asserts the two 2006 robbery incidents at the branch (1) occurred more than two years before the crime in question and therefore "are too remote to be considered in the foreseeability analysis," (2) "were predicated on demands for money inside the branch," (3) did not involve firing a gun, (4) did not involve an armored car or armed guards, (5) did not result in any injuries or deaths, and (6) were not "perpetrated on any person using or servicing the ATM." Additionally, Chase contends in part (1) neither the GMR reports nor the crime statistics generated by the Dallas Police Department can satisfy the proximity element because they do not "identify the geographic area from which the statistics were derived" and, without that information, "it is impossible to determine whether any of the crimes in those reports occurred in the branch's 'immediate vicinity'"; (2) "the similarity prong requires analysis of the specific details of prior crimes in order to compare them to the details of the crime in question" and "[s]uch comparisons are impossible based on the crime statistics appellees rely upon because the reports simply list the annual number of occurrences of certain categories of crime"; and (3) the GMR reports and Dallas Police Department statistics "provide no details whatsoever of the crimes themselves that would be sufficient to satisfy the publicity factor, and there is no evidence that Chase was familiar with the particular facts of any of the crimes listed in the reports."

Appellees respond in part that "Chase reduces an analysis of the 'recency and frequency' factors to little more than a bean-counting exercise." According to appellees, that is contrary to the supreme court's statements in *Trammell Crow* that "numeric comparisons may be imperfect and may omit important, less-easily-quantified considerations" and "no one ratio or odds calculation conclusively resolves the frequency analysis." *See Trammell Crow*, 267 S.W.3d at 16. Specifically, appellees argue in part,

> Here, although the 2006 robberies occurred more than three years before the attack on Borquez, Chase itself regarded them as highly important events even in

2009—so much so, in fact, that Chase placed the branch into its "high risk" category and "left it at that threshold" even up to the present. And importantly, Chase continued to characterize the branch as a "high risk" for robberies, even though (as Chase now emphasizes) the branch experienced no other violent crimes in the interim. From Chase's own perspective, the two previous incidents alone were sufficiently recent and frequent to make them reliable predictors of violent crime at the branch.

(citations to record omitted). Further, appellees contend (1) the two 2006 robbery incidents at the branch and the 2009 crime against Borquez all "involved physical force, including the use of a deadly weapon, in an attempt to steal the branch's money" and (2) "any minor differences between the 2006 incidents and the Borquez incident become even more immaterial, for purposes of foreseeability, in light of the widely-publicized robbery of an armored car guard that occurred on February 2009 at an ATM located only a few miles from the branch."

As in *Park*, we first consider the *Timberwalk* factors of "proximity and publicity." *See Park*, 429 S.W.3d at 147. There is no dispute that Chase was aware of the two 2006 robbery incidents at the branch described above. As to whether the crimes listed in the GMR reports were in the "immediate vicinity" of the branch, the record shows the "area" used in the GMR reports was Dallas police beat 415. While Eldredge testified that a crime within the same beat as a particular site would not be "miles away" because a beat would not be that large, there is no evidence in the record showing the size of beat 415 or the particular location within the beat where any of the crimes occurred. Further, the record does not "show what publicity was given" as to any of those crimes. *See id*. Additionally, as to the February 2009 robbery of a Loomis armored car guard, the record shows that crime (1) occurred at a Bank of America branch in the "Red Bird" area of Dallas in "beat 456" and (2) was publicized by the Dallas Morning News and a Dallas police bulletin. However, despite appellees' assertion in their appellate brief that the February 2009 robbery occurred "only a few miles from the branch," appellees cite no evidence in the record, and we have found none, that describes the distance between the bank where that

crime occurred and the Stevens Park branch or between beat 456 and beat 415, in which the Stevens Park branch is located.

Next, we consider "recency and frequency" together. *See id*. at 147. As described above, this Court stated in *Park* that "[t]he supreme court referred to two years as a 'reasonable time' and we agree." *Id*. at 148 n.3. Further, in the *Trammell Crow* case cited by appellees, the supreme court applied a two-year time frame in its analysis respecting foreseeability and did not discuss or address enlarging that time frame. *See Trammell Crow*, 267 S.W.3d at 13; *see also Mellon Mortg. Co.*, 5 S.W.3d at 657 (applying two-year time frame in analysis of foreseeability of third party crime). Additionally, as to the fact that Chase categorized the Stevens Park branch as "high risk" for robbery and "left it at that threshold," this Court stated in *Park* that "[t]he mere act of taking preventive measures to protect against the possibility of future crime is not the same as foreseeing that criminal activity." *Park*, 429 S.W.3d at 149. Appellees cite no authority, and we have found none, to support their position that Chase's continuing categorization of the Stevens Park branch as "high risk" for robbery warrants consideration of the two 2006 robbery incidents at the Stevens Park site, which are outside the two-year time frame described in *Park* as "reasonable." *Id*. at 148 n.3. Further, the record shows (1) the GMR reports and Dallas Police Department crime statistics show crimes committed during one-year periods for the years covered, i.e., collectively, 2005–2009, but do not show specific dates for those crimes, and (2) the robbery of a Loomis armored car guard described above took place on February 13, 2009. The record does not show any of those crimes were committed in the six months before Borquez's shooting. *See id*. at 147 (considering whether previous violent crimes had been committed on site in six months preceding crime in question).

Last, we consider the "similarity" of the past crimes to the criminal conduct in question. *Id*. As described above, (1) the two 2006 robbery incidents at the branch involved attempts to

steal money from the interior of the bank and (2) no one was injured in those incidents or the 2009 robbery of the Loomis armed guard described above.

As to the GMR reports, appellees assert in a footnote in their appellate brief that in *Mellon Mortgage Co.*, the supreme court held that "similar area crime statistics provided sufficient evidence of foreseeability." *Mellon Mortage Co.* involved a premises owner's liability for a sexual assault committed in a parking garage. *See Mellon Mortg. Co.*, 5 S.W.3d at 654. The evidence in that case showed that in the two years preceding the incident, 190 violent crimes, including rape and murder, were reported "near the garage." *Id.* at 657. However, no evidence identifying the details of those crimes was presented at trial. *Id.* The supreme court concluded that those facts, "together" with evidence of property crimes and vagrancy within the garage, "constitute[d] some evidence that violent criminal conduct was foreseeable." *Id.* In this case, the GMR reports and Dallas Police Department crime statistics show only the number of the types of crimes committed within a designated area. There is no evidence in the record respecting details of those crimes. Unlike the "area" crime statistics in the case before us, the crimes reported "near the garage" in *Mellon Mortgage Co.* included only crimes within a quarter-mile radius of the garage. *See id.* at 657, 664 (Baker, J., concurring), 667 (O'Neill, J., dissenting). Further, as described above, the court in *Mellon Mortgage Co.* considered those statistics together with other evidence. *Id.* at 657. On this record, we cannot agree with appellees' position that the supreme court's conclusion respecting foreseeability in *Mellon Mortgage Co.* is determinative in this case.

Considering all of the *Timberwalk* factors together, we conclude as a matter of law that the risk of injury from violent crime on the premises in question was not foreseeable based on evidence of prior crimes. *See Park*, 429 S.W.3d at 148; *see also QuikTrip Corp.*, 449 S.W.3d at 674 n.18 (concluding "as a matter of law" that crime in question was not foreseeable, despite

jury's finding of premises liability, because foreseeability is question of law for court when parties "do not identify disputed, material facts" that would impact determination of foreseeability, but rather "disagree about the legal significance of undisputed facts").

Additionally, appellees contend (1) "[t]he *Timberwalk* factors are not the only reasons that a criminal act might be foreseeable" and (2) "the 'nature and character' of the branch— coupled with its 'location, mode of doing business, [and] observation or past experience'— made violent criminal activity just as foreseeable to Chase as it was to the bar owner in *Del Lago Partners*" (citing and quoting *Del Lago Partners*, 307 S.W.3d at 768–69). In accordance with *Park*, we consider the evidence cited by appellees in support of those contentions.[11] *See Park*, 429 S.W.3d at 148 (considering "other" evidence in addition to evidence of prior crimes in foreseeability analysis).

Specifically, as to "nature and character," appellees argue in part,

[B]ranch banks with unmanned ATMs—like the one involved in the attempted robbery here—are of a "nature and character" that make them an especial and foreseeable target of violent crime. This reality is reflected in the Texas Finance Code, which requires owners of "unmanned teller machines" to "evaluate the safety of each unmanned teller machine" and to: consider "the presence of obstructions . . . in the area of the machine and the access area and defined parking area . . ."; consider "the incidence of violent crimes in the immediate neighborhood of the machine as shown by local law enforcement records and of which the owner or operator has actual knowledge"; give customers "a notice of basic safety precautions" to follow when using the machine; and install and maintain security devices, including video surveillance equipment, adequate lighting, and new technologies.

(citing and quoting TEX. FIN. CODE ANN. §§ 59.308–.310 (West 2013)). Further, according to appellees, (1) "[n]one of these statutory safeguards would be necessary if the Texas legislature

---

[11] Chase argues in a footnote in its appellate reply brief as follows:

The Fort Worth Court of Appeals has recently confirmed the narrow scope of *Del Lago*, stating that when foreseeability is based upon prior criminal conduct, *Timberwalk* applies, and that the reasoning of *Del Lago* can only apply when there is "actual and direct knowledge" of an "imminent" occurrence on the premises.

(citing *QuikTrip Corp.*, 449 S.W.3d at 671). To the extent Chase's argument can be construed to assert that this Court's analysis in this case should not extend beyond the *Timberwalk* factors, we need not reach that issue in light of our conclusions below respecting the additional evidence cited by appellees.

did not believe that ATMs are inherently and foreseeably susceptible to violent crimes" and (2) "Chase indisputably was aware of both the statute and the risks of ATMs, having subcontracted with GMR Protection Resources to perform the required safety evaluations."

Chase argues in part that "appellees' implication that the Texas Legislature somehow acknowledged that ATMs are inherently dangerous by enacting [the finance code provisions described above] is wrong." Additionally, Chase asserts the finance code (1) does not "suggest standards for when premises owners must place armed guards at ATMs" or "create any duty of care on the part of ATM owners" and (2) states in section 59.304 that "[a] violation of this subchapter or a rule adopted under this subchapter is not negligence per se."

The three finance code sections cited by appellees are part of the subchapter described above titled "Safety at Unmanned Teller Machines." While that subchapter requires owners of unmanned ATMs to meet the requirements described above, "foreseeability" is not specifically mentioned or addressed therein. *See id*. §§ 59.301–.310. Moreover, as described above, "[t]he mere act of taking preventive measures to protect against the possibility of future crime is not the same as foreseeing that criminal activity." *Park*, 429 S.W.3d at 149.

Next, appellees argue Chase "was also aware that its branch faced among the highest risk of robberies of all of its Dallas branches with outdoor ATMS." Specifically, appellees contend in part (1) the branch was struck twice by armed robbers within only a few months of its 2005 opening; (2) in one of those robberies, "a robber approached a banker who had gone outside to help a customer with an ATM deposit"; (3) as a result of those robberies, Chase categorized the branch as a "high" risk for robberies and left it at that threshold "despite having installed bullet-resistant glass in the lobby"; (4) Preola "acknowledged" at trial that "[w]e owe our customers and vendors to take measures to protect them on our property"; (5) according to police statistics, the "beat" in which the branch was located experienced 599 violent crimes in 2006, 561 in 2007,

468 in 2008, and 440 in 2009, with "the number of business robberies holding steady at 9 for three of those four years"; (6) "crime statistics that GMR provided to Chase in 2009 revealed that the branch's area experienced far more violent crimes in 2008—including 15 aggravated assaults and 33 robberies—than any of the other 36 Chase branches that also had ATMs"; and (7) "[j]ust six months before Borquez was killed, Dallas police and local media reported that two armed men robbed a Loomis armored car guard as he was loading an ATM at a nearby bank in South Oak Cliff, escaping with the guard's weapon and money bag." [12]

As to the categorizing of the Stevens Park branch as "high" risk for robbery and the employment of off-duty troopers to guard the premises for several weeks after each of the 2006 robbery incidents, we have already stated above that "[t]he mere act of taking preventative measures to protect against the possibility of future crime is not the same as foreseeing that criminal activity." *See Park*, 429 S.W.3d at 149. Additionally, the crime statistics described by appellees are the same statistics we concluded above do not show foreseeability. Further, to the extent appellees contend foreseeability was shown by Preola's testimony that it is his "understanding" that "[w]e owe our customers and vendors to take measures to protect them on our property" and/or the testimony of appellees' experts, such evidence does not "create a duty where none exists at law." *Id*. at 149–50; *accord QuikTrip Corp.*, 449 S.W.3d at 676.

Finally, we address appellees' assertion that "the 'nature and character' of the branch—coupled with its 'location, mode of doing business, [and] observation or past experience'—made violent criminal activity just as foreseeable to Chase as it was to the bar owner in *Del Lago Partners*." In *Del Lago Partners*, the supreme court "expressly clarified that it was not announcing a general rule." *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 206 (Tex. 2015)

---

[12] While appellees' brief on appeal describes the Bank of America branch in question as being in "South Oak Cliff," they cite no evidence in the record that supports that description, nor do they cite evidence in the record as to the distance between that branch and the Stevens Park branch. Further, as described above, the record shows the robbery of a Loomis guard at that Bank of America branch occurred on February 13, 2009, approximately seven months before the September 18, 2009 crime in this case.

(citing *Del Lago Partners*, 307 S.W. 3d at 770 ("We do not announce a general rule today.")).

Additionally, as described by the supreme court in its "narrow and fact-specific" holding in *Del Lago Partners*, that case involved a duty that arose because Del Lago "was aware of an unreasonable risk of harm at the bar that very night." *Del Lago Partners*, 307 S.W.3d at 769. The supreme court specifically explained "Del Lago had actual and direct knowledge that a violent brawl was imminent between drunk, belligerent patrons and had ample time and means to defuse the situation." *Id*. In the case before us, appellees do not contend, and the record does not show, that Chase had "actual and direct knowledge" that any violent crime on the branch's premises was "imminent" on the date in question. Therefore, *Del Lago Partners* is distinguishable. *See id*.

On this record, we conclude as a matter of law that the risk of injury from violent crime on the premises in question was not foreseeable to Chase. *See Park*, 429 S.W.3d at 150; *see also QuikTrip Corp*., 449 S.W.3d at 677 n.18. Therefore, Chase owed no duty in this case. *See Park*, 429 S.W.3d at 150; *see also Trammell Crow*, 267 S.W.3d at 17.

We decide in favor of Chase on its first issue.

### III. CONCLUSION

We decide Chase's first issue in its favor. Accordingly, we need not reach Chase's remaining issues.[13] Therefore, we reverse the trial court's judgment and render a take-nothing judgment in favor of Chase.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

140131F.P05

---

[13] Chase's second issue asserts, in part, a challenge to the sufficiency of the evidence to support "proximate cause" respecting appellees' claims for negligence and premises liability. "Proximate cause comprises two elements: cause-in-fact and foreseeability." *Del Lago Partners*, 307 S.W.3d at 774. While Chase's first issue is dispositive of this appeal and we therefore do not address its second issue, "[t]he 'foreseeability' analysis is the same for both duty and proximate cause." *See id*.



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JPMORGAN CHASE BANK, N.A.,
Appellant

No. 05-14-00131-CV      V.

SOFIA BORQUEZ, INDIVIDUALLY AND
ON BEHALF OF THE ESTATE OF
CRESENCIO BORQUEZ, MERCEDES
BORQUEZ, INDIVIDUALLY, AND JOEL
BORQUEZ, INDIVIDUALLY, Appellees

On Appeal from the County Court at Law
No. 1, Dallas County, Texas
Trial Court Cause No. CC-09-09096-A.
Opinion delivered by Justice Lang, Justices
Francis and Evans participating.

In accordance with this Court's opinion of this date, we **REVERSE** the judgment of the trial court and **RENDER** a take-nothing judgment in favor of appellant JPMorgan Chase Bank, N.A.

It is **ORDERED** that appellant JPMorgan Chase Bank, N.A. recover its costs of this appeal from appellees Sofia Borquez, individually and on behalf of the Estate of Cresencio Borquez, Mercedes Borquez, individually, and Joel Borquez, individually.

Judgment entered this 3rd day of November, 2015.